UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.

KEVONDRICK M. JOHNSON,

                Defendants.

Case No. 16-cr-20172

HON. LINDA V. PARKER
United States District Judge

_____

**GOVERNMENT'S RESPONSE OPPOSING
DEFENDANT'S REQUEST FOR HOME CONFINEMENT**
_____

The defendant, Kevondrick M. Johnson, fired several gunshots from a powerful pistol at a 12-year old boy. The boy walked to Johnson's residence seeking to retrieve his bicycle, which had been stolen earlier in the day by kids living at Johnson's residence. As the boy approached Johnson's home, Johnson came out of the house and fired several gunshots at the boy who ran for his life. Several days later, law enforcement officers searched Johnson's home and found an AK-47-style semi-automatic pistol and a box of 7.62 x 39mm ammunition. Because Johnson had three prior felony convictions, he was prohibited from possessing the gun and ammunition. This Court sentenced Johnson to 67 months imprisonment.

Johnson began serving his current sentence on July 18, 2017. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A) requesting the Court to order that his sentence be reduced to home confinement. His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of May 12, 2020, these directives have already resulted in at least 2,431 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, Johnson does not qualify for compassionate release. Because Johnson has not sought compassionate release from the Bureau of Prisons based on Covid-19, as required under 18 U.S.C. § 3582(c)(1)(A), the Court does not have jurisdiction to address his Covid-19-based argument until he exhausts his administrative remedies. Nor, in any event, does Johnson satisfy the statutorily mandated criteria for compassionate release. Because § 3582(c)(1)(A) requires that release be

"consistent with" the Sentencing Commission's policy statements, Johnson's failure to meet the criteria in USSG § 1B1.13 alone forecloses relief. Even when Covid-19 is taken into account, Johnson's age and medical conditions do not satisfy the requirements in § 1B1.13(1)(A) & cmt. n.1. Johnson is 37 years old is not suffering from a terminal illness or other serious medical condition. His offense and criminal history also make him a danger to the community, *see* USSG § 1B1.13(2), because Johnson illegally possessed a semi-automatic firearm equipped with a high capacity magazine, and he discharged the firearm at a 12-year old boy. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release for those same reasons.

**Background**

Johnson has three prior felony drug-related convictions.  Despite this, Johnson possessed an AK-47-style semi-automatic pistol, which contained a large capacity magazine.  Law enforcement search Johnson's residence and found this firearm several days after Johnson shot a firearm at a 12-year old boy.  Johnson was subsequently convicted of being a felon in possession of firearm and sentenced to 67 months imprisonment.

Johnson began serving his prison sentence on July 18, 2017, and is currently incarcerated at Milan FCI. He is 37 years old, and his projected release date is October 1, 2020. His only underlying medical conditions include a possible bout of

anemia, and alcohol, opioid, and marijuana use disorder. Nevertheless, Johnson has moved for compassionate release citing the Covid-19 pandemic; however, the government would again note that Johnson failed to exhaust his administrative remedies before submitting his motion for compassionate release.

**Argument**

**I.    The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

**A.    The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. The current plan, which is in effect until May 18, 2020, requires that inmates in every institution be secured in their assigned cells or quarters for at least 14 days to stop the spread of the disease. Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are issued face masks to wear

in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. And the movement of inmates and detainees between facilities is severely restricted, with exceptions only for medical treatment and similar exigencies.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

**B.     The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 2,428 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus

appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions, social-distancing protocols, and stay-at-home orders during the pandemic. And if a prisoner would be unlikely to take any Covid-19 restrictions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

The Bureau of Prisons also must account for the current strain on society's first responders. Police departments in many cities have stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Flint, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety, and those risks will only increase if communities are faced with a sudden influx of prisoners. That is just one reason, among many, why the Bureau of Prisons must focus on

releasing inmates who are the most vulnerable to Covid-19 and whose release will least endanger the public.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of

Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.    The Court should deny Johnson's motion for compassionate release.

Johnson's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, § 3582(c)(1)(A), and release must be "consistent with" the Sentencing Commission's policy statements. As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A.   The Court is barred from granting release because Johnson has not exhausted his administrative remedies.

The Court must dismiss Johnson's motion, because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). As the Sixth Circuit has explained, there is a "sharp divide" that "separates statutory from prudential exhaustion." *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019). Unlike judicially crafted requirements, statutory requirements may not be excused, even to account for "special circumstances." *Ross*, 136 S. Ct. at 1856–57.

Section 3582(c)(1)(A) is likely even a *jurisdictional* bar on the Court's authority to consider a motion for compassionate release. The Sixth Circuit has labeled § 3582(c)'s limitations "jurisdiction[al]." *Williams*, 607 F.3d at 1125. The statute

"speak[s] to the power of the court rather than to the rights or obligations of the parties." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994). And it delineates "when, and under what conditions," a court may exercise its "'adjudicatory authority.'" *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005)). But even if § 3582(c) requirements were not considered truly jurisdictional, they would still be mandatory claim-processing rules that must be enforced when a party "properly rais[es]" them. *Eberhart*, 546 U.S. at 19 (2005). Thus, regardless of how it is labeled, § 3582(c)(1)(A)'s exhaustion requirement is mandatory. *See Ross*, 136 S. Ct. at 1856–57; *United States v. Marshall*, 954 F.3d 823, 826–29 (6th Cir. 2020).

The only court of appeals to address this question has agreed. In *United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020), the Third Circuit held that the Covid-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement. Rather, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at 597.

The majority of district courts to decide this question nationwide, including many in our district, have similarly held that a "failure to exhaust" under § 3582(c)(1)(A) "cannot be excused, even in light of the Covid-19 pandemic." *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2–*3 (E.D. Mich. Apr. 8, 2020); *accord*

13

*United States v. Shah*, No. 16-20457, 2020 WL 1934930, at \*2 (E.D. Mich. Apr. 22, 2020); *United States v. Mathews*, No. 14-CR-20427-02, 2020 WL 1873360, at \*2–\*3 (E.D. Mich. Apr. 15, 2020). As one of the those decisions has explained, the few courts that have excused exhaustion under § 3582(c)(1)(A) have mistakenly relied on cases addressing *judge-made* exhaustion requirements, not *statutory* exhaustion requirements. *Mathews*, 2020 WL 1873360, at \*2–\*3.

Congress's reasons for § 3582(c)(1)(A)'s exhaustion requirement apply with even greater force during the COVID-19 pandemic. The Bureau of Prisons is already responding to the pandemic—not just through heightened safety measures, but by evaluating its entire prison population for home confinement. By requiring a defendant to exhaust, § 3582(c)(1)(A) gives the Bureau of Prisons the opportunity to gather his medical documentation and other records, evaluate his request, and decide in the first instance whether it justifies either compassionate release or some other form of relief. As the Third Circuit observed: "Given BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 954 F.3d at 597.

Johnson did not exhaust his administrative remedies. Johnson has only made a request with this Court via letter.  According to the BOP, Johnson has not made any

formal request with FCI Milan for home confinement.  Johnson has therefore not satisfied § 3582(c)(1)(A)'s mandatory exhaustion requirement.

### B.   There are no extraordinary and compelling reasons to grant Johnson compassionate release.

Even if Johnson had exhausted his administrative remedies, compassionate release would be improper.  Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describe[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

Here, Johnson does not even allege any extraordinary or compelling reasons to grant compassionate release.  He makes only a vague reference in his letter to "the virus."  However, the Covid-19 pandemic by itself does not qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate

release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Johnson and other inmates. Nothing in the statute or USSG § 1B1.13 supports the unbounded interpretation of § 3582(c)(1)(A) that he now asks this Court to adopt. *See Raia*, 954 F.3d at 597.

Johnson is also ineligible for compassionate release for another reason: he remains a danger to the community. Section 1B1.13(2) only permits release if a defendant is "not a danger to the safety of any other person or to the community." Johnson's illegal possession and discharge of an assault-style semi-automatic pistol with a high capacity magazine clearly demonstrates the danger he poses to the community.  This factor, too, forecloses relief here.

Johnson is not eligible for compassionate release.

### C.     The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is still appropriate.

The nature and circumstances of Johnson's offense clearly demonstrate his dangerousness.  Johnson, a three-time felon, illegally possessed an assault-style

semi-automatic pistol equipped with a large capacity magazine.  And, as this Court found, Johnson fired a gun at a 12-year old boy just days prior to police seizing the gun from Johnson's home.  (R. 37: Sent. Tr., Pg ID 203-217).  This Court also found that after his arrest, Johnson attempted to solicit a minor to accept responsibility for Johnson's crime.  *Id.* at Pg ID 217.  The Court considered the § 3553(a) factors when it imposed the Defendant's original 67-month sentence. That sentence reflected, among other factors, the seriousness of the Defendant's offense, the history and characteristics of the Defendant, and the need to protect the public from further crimes of the Defendant. Even if the Court were to find Johnson eligible for relief, consideration of those same § 3553(a) now weighs heavily in favor of disqualifying him from receiving compassionate release.

## III.   If the Court were to grant Johnson's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Johnson's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

18

**Conclusion**

Johnson's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

Date:  May 13, 2020

s/ANTHONY P. VANCE
ANTHONY P. VANCE
Assistant United States Attorney
600 Church Street
Flint, Michigan 48502-1280
Phone: (810) 766-5177
Fax: (810) 766-5427
anthony.vance@usdoj.gov
P61148

## *CERTIFICATION OF SERVICE*

I hereby certify that on May 13, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system.  I further certify that I forwarded a copy of said document via U.S. First Class mail to:

KEVONDRICK M JOHNSON
REGISTER NUMBER: 54619-039
FCI MILAN
FEDERAL CORRECTIONAL INSTITUTION
P.O. BOX 1000
MILAN, MI  48160

Dated: May 13, 2020

s/ Kristi Bashaw
United States Attorney's Office